UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

INTER-AMERICAN DEVELOPMENT BANK,

                  Plaintiff,

       -against-                          06 Civ. 6222 (LAK)

NEXTG TELECOM LTD., et al.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8 - 28 - 2007_

## MEMORANDUM OPINION

Appearances:

> Scott S. Balber
> Gretchen N. Werwaiss
> Laura M. Jastrem
> CHADBOURNE & PARKE LLP
> *Attorneys for Plaintiff*
>
> Mitchell A. Karlan
> Kathryn E. Matthews
> LaShann M. DeArcy
> Anne M. Coyle
> GIBSON, DUNN & CRUTCHER LLP
> *Attorneys for Defendants Brickfield, Leland, and Ochoa-Brillembourg*

LEWIS A. KAPLAN, *District Judge.*

       This action arises out of the default by a Bolivian telecommunications company on

a $37 million loan. The lender sues, among others, the shareholders of the borrower's parent

company for breach of contract and indemnification in connection with the default. Three minority

shareholders move for summary judgment dismissing the claims against them.

*Facts*

The following facts are undisputed for purposes of this motion unless otherwise indicated.

I.    *The Loan Agreement*

In May 2003, plaintiff Inter-American Development Bank ("IDB"), an international organization owned by 47 member countries including the United States,[1] entered into a loan agreement with AXS Bolivia, S.A. ("AXS") (the "Loan Agreement"),[2] one of the largest telecommunications companies in Bolivia and at that time the wholly owned subsidiary of the international power company AES Corporation ("AES").[3] IDB agreed to lend AXS up to $37 million[4] to finance the construction of a telecommunications network in Bolivia.[5] To provide security

---

[1]     Balber Decl. Ex. 1 (Ratliff Decl.) ¶ 2; *see* 22 U.S.C. § 283 (United States' acceptance of membership in IDB).

        The Court has jurisdiction over actions brought by IDB pursuant to 22 U.S.C. § 283f.

[2]     AXS formerly was known as AES Communications Bolivia, S.A. Plaintiff states in its memorandum, and defendants do not dispute, that the company changed names in the summer of 2004. Pl. Mem. 3 n.3. Indeed, the parties use both names interchangeably. Accordingly, the Court does the same.

[3]     Balber Decl. Ex. 1 (Ratliff Decl.) ¶¶ 4-5.

[4]     *See* Matthews Decl. Ex. 2 [hereinafter "Loan Agreement"] § 3.1.

[5]     Def. Rule 56.1 St. ¶¶ 1-2.

for the loan, AXS signed various related agreements requiring it, among other things, to deposit its revenues into trust accounts created for IDB's benefit.[6]

The Loan Agreement provided that AXS would be in default if, *inter alia*, it failed to make required payments to IDB,[7] challenged the validity or enforceability of the Loan Agreement or related transaction documents,[8] entered into a transaction worth more than $100,000 without IDB's consent,[9] or failed to deposit revenues into trust accounts for IDB's benefit.[10]

II.     *The Share Retention Agreement with AXS's Shareholders*

According to IDB employee Michael Ratliff, when IDB makes a loan, it frequently "seek[s] to ensure that the borrower's shareholders are persons or entities that will remain involved in the borrower's operations and will take the necessary steps – whether by equity contributions, board or shareholder actions or otherwise – to ensure that a project with respect to which IDB has loaned funds achieves completion."[11] It therefore requires a borrower's shareholders to enter into agreements making them "responsible for the borrower's obligations to IDB in a way in which

---

[6]     Balber Ex. 3 (Off-Shore Collateral Accounts Agreement) § 3.2; *id.* Ex. 4 (Contrato de Fideicomiso); *see* Loan Agreement § 1.1.205 (referring to Contrato de Fideicomiso and explaining its purpose).

[7]     *See* Loan Agreement § 7.2.1.

[8]     *Id.* § 7.2.2.4.

[9]     *Id.* §§ 6.2.16; 7.2.2.2.

[10]    *Id.* § 7.2.2.2.

[11]    Balber Decl. Ex. 1 (Ratliff Decl.) ¶ 9.

4

shareholders of a company typically are not, *i.e.*, beyond the value of their equity investment."[12] This "provide[s] additional support for the borrower's obligations to IDB" beyond what is contemplated by ordinary loan agreements.[13]

In accordance with this policy, IDB and the various AES entities that directly or indirectly owned AXS entered into a Share Retention and Maintenance of Control Agreement (the "SRA") in September 2003.[14] The contract provided in relevant part that the AXS shareholders would not cause or permit AXS to default on the Loan Agreement and that they would vote their shares at shareholder meetings and cause their directors to vote at board meetings so as to ensure that AXS would not default.[15] The SRA provided also that the AXS shareholders would indemnify IDB for losses in connection with litigation related to the SRA.[16] In addition, Section 3 provided that the AXS shareholders would not transfer their interests in AXS without the prior consent of IDB and that IDB would not consent to such a transfer unless the transferee signed an agreement substantially similar to the SRA.[17]

---

[12]     *Id.*

[13]     *Id.*

[14]     Balber Decl. Ex. 5.

[15]     *Id.* §§ 6(d), 6(e).

[16]     *Id.* § 16.

[17]     *Id.* §§ 3(a), 3(c).

III.    *The Sale of AXS*

    A.    *The First Stock Purchase Agreement*

AES at some point decided to sell its interests in AXS. It assembled a proposed investor group comprised of three Bolivian investors – Giovanni Domingo Ortuño, Mario Castal Quiroga, Sergio Antonio Gottret (the "Bolivian Shareholders") – and four U.S. investors – Marc Leland, Hilda Ochoa-Brillembourg, Peter Brickfield, and William Delphos (the "U.S. Shareholders"). It conducted due diligence on each proposed investor before seeking IDB's consent to sell AXS.[18] IDB conducted due diligence as well in order to make sure that the investors had "the ability – both financially and in terms of their expertise – to ensure the AXS project's successful completion."[19]

The seven investors (the "NextG Shareholders") entered into a Stock Purchase Agreement on August 25, 2003 with AES Bolivia Holdings, Ltd. ("AES Holdings") – an AES subsidiary that owned AXS through AES Bolivia Holdings II, Ltd. ("AES Holdings II").[20] The agreement provided that the investors would form a Cayman Islands company called NextG Telecom Ltd. ("NextG") and that they would cause NextG to purchase from AES Holdings an 85.5 percent interest in AES Holdings II.[21]

---

[18]    *See* Balber Decl. Exs. 7-8 (memoranda summarizing AES's due diligence on proposed investors).

[19]    Balber Decl. Ex. 1 (Ratliff Decl.) ¶¶ 12-15.

[20]    Matthews Decl. Ex. 7.

[21]    *See id.* at 1, § 4.01.

6

B.      The Formation of NextG

According to a Shareholders' Agreement among the NextG Shareholders (the "Shareholders' Agreement"), NextG "was formed on September 2, 2003 for the sole object of holding and managing its stock and participation in [AES Holdings II]."[22]

1.      Ownership

Although the evidence is not entirely clear, it appears that NextG, at the time of its formation, was 50 percent owned by the Bolivian Shareholders[23] and 50 percent owned by defendant Global International Holdings ("GIH"), which in turn was wholly owned by Delphos.[24] On June 18, 2004, the U.S. Shareholders each acquired from GIH a 1.17 percent interest in NextG in exchange for their promises to make capital contributions to NextG.[25]

---

[22]
    Matthews Decl. Ex. 9 at 1.

[23]
    Ortuño owned 21.404 percent, Quiroga 17.708 percent, and Gottret 10.888 percent. See Cpt. Ex. B [hereinafter "Ownership Chart"].

[24]
    See id.

    Delphos owned GIH through a company called Delphos International, Ltd.  Balber Decl. Ex. 6 (Delphos Depo.) at 51.

[25]
    Def. Rule 56.1 St. ¶ 7; Matthews Decl. Ex. 10 (June 18, 2004 commitment letter); Ownership Chart.

2. *Governance*

Both the Shareholders' Agreement and NextG's articles of association[26] provide that a general shareholder meeting may be convened only by NextG's board of directors or "on the written requisition, duly signed, of any holder or holders of not less than fifteen percent of the issued voting shares."[27] In addition, "the affirmative vote of the holders of 75% of the issued shares, present in person or by proxy, is required to adopt any shareholders' resolution."[28]

The documents provide further that NextG's board of directors shall consist of five members: two nominated by the Bolivian Shareholders, two by the U.S. Shareholders, and a fifth nominated by one of the two groups depending on the year. The groups alternate years nominating the fifth board member.[29] In addition, two-thirds of the votes of NextG's directors is required in order to resolve certain matters, including, *inter alia*, the hiring and discharge of the chief executive officer, the nomination of directors and representatives of AES Holdings II, and any alteration to NextG's share capital. A majority vote is required to resolve most other issues.[30]

C.  *The Share Retention Agreement with the NextG Shareholders*

On June 18, 2004, pursuant to Section 3 of the SRA, NextG and all of its shareholders

---

26

Matthews Decl. Ex. 14.

27

*E.g., id.* ¶ 57.

28

*E.g., id.* ¶ 71.

29

*E.g., id.* ¶ 81.

30

*E.g., id.* ¶ 99.

8

entered into a Share Retention and Maintenance Control Agreement (the "SRA II")[31] that was substantially similar to the SRA. Section 5 provided in relevant part as follows:

> "**Section 5.**    **Other Covenants**. Each of the [NextG Shareholders] . . . hereby covenants and agrees that, throughout the term of this Agreement:
>
> \*        \*        \*
>
> (e)    it shall . . . not permit, authorize or otherwise cause any Default [of the Loan Agreement]; and
>
> (f)    it shall (i) vote its Controlled Shares, at meetings of the shareholders of [NextG] . . . so as to direct [AXS] to perform its obligations under the [Loan Agreement] and (ii) cause its nominated directors on the board[] of directors of [NextG] to vote at meetings of the board[] of directors . . . to fulfill its obligations hereunder and to direct [AXS] to perform its obligations under the [Loan Agreement]."[32]

In addition, Section 15 provided that the NextG Shareholders would

> "indemnify . . . IDB . . . [for] any losses liabilities, claims, damages or expenses incurred by . . . IDB . . . in connection with . . . any . . . litigation . . . arising out of or in connection with or relating to this Agreement or transactions contemplated hereby, whether or not such . . . litigation . . . is brought by . . . IDB or any other Person, or IDB is otherwise a party thereto."[33]

---

[31]

Balber Decl. Ex. 14 [hereinafter "SRA II"].

[32]

*Id.* § 5.

To be precise, Section 5 governed the obligations of NextG, GIH, and the NextG Shareholders with respect to shareholder and board meetings of any of the companies that directly or indirectly owned AXS. There is no evidence, however, that the movants owned shares, or were able to nominate directors, of any other company than NextG.

[33]

*Id.* § 15.

D.     *The Second Stock Purchase Agreement*

On June 30, 2004, NextG purchased the remaining shares of AES Holdings II, Ltd. from AES Holdings.[34] It thereby became the sole owner of AXS.[35]

E.     *The Share Charge Agreement*

NextG and JP Morgan Chase Bank ("JP Morgan") subsequently entered into a Share Charge Agreement (the "SCA") pursuant to which NextG agreed to deliver to JP Morgan (1) undated share transfer certificates for all of the issued shares of AES Holdings II, (2) certificates representing such shares, (3) "an executed proxy and power of attorney made in respect of [the shares] in favour of [JP Morgan] in respect of all general meetings and written resolutions of [AES Holdings II]," (4) executed but undated letters of resignation from the directors of AES Holdings II, and (5) "an undertaking" from AES Holdings II to register transfers of its shares to JP Morgan.[36]

The SCA provided also that NextG would be permitted to vote its shares of AES Holdings II so long as AXS did not default on the Loan Agreement.[37] In the event of a default, however, IDB would have the option of instructing JP Morgan to vote the shares of AES Holdings

---

[34]

*See* Matthews Decl. Ex. 8 (June 30, 2004 Stock Purchase Agreement).

[35]

NextG currently owns 100 percent of NextG Bolivia Holdings II, Ltd. – the successor to AES Holdings II – which is the sole owner of three subsidiaries, AES International Rayml, Ltd. ("Rayml"), AES Cholita, Ltd. ("Cholita"), and AES Condor, Ltd. ("Condor"). Rayml and Condor each own small stakes in AXS directly. They and Cholita collectively own a company called AES Bolivia Ltda., which owns the remaining shares of AXS. *See* Ans. ¶ 2; Ownership Chart.

[36]

Matthews Decl. Ex. 18 [hereinafter the "SCA"] § 4.2.

[37]

*Id.* § 5.1.

II and to remove the company's directors by dating the letters of resignation.[38]

### F.   Capital Contributions

In late 2004 and early 2005, the U.S. Shareholders contributed $100,000 to NextG, which resulted in each of them holding a 2.1 percent interest in the company.[39]

### III.   The Defaults

AXS subsequently defaulted on the Loan Agreement in numerous ways. First, the AXS board on April 15, 2005 authorized the company to enter into two transactions worth more than $100,000 without IDB's consent.[40] Second, beginning in August 2005, AXS failed to pay principal, interest, fees, and other amounts owed under the Loan Agreement or to cure these defaults.[41] Third, at least as of late 2005, AXS had failed to deposit revenues into trust accounts for IDB's benefit.[42]

Upon AXS's defaults, IDB decided not to exercise its rights under the SCA.[43] Instead,

---

[38]

Id. § 7.1.

[39]

See Pl. Rule 56.1 St. ¶ 8; Def. Rule 56.1 St. ¶ 8.

[40]

See Balber Decl. Exs. 23-24.

[41]

See Matthews Decl. Ex. 3 (Rakowszcyk Depo.) at 39.

[42]

See Balber Decl. Ex. 25.

Defendants do not dispute that these defaults occurred. See Def. Rule 56.1 St. ¶ 37; see also Def. Mem. 9, 12.

[43]

Def. Rule 56.1 St. ¶ 37.

it sent a March 8, 2006 letter to the NextG Shareholders requesting that they cause AXS to comply with the Loan Agreement.[44] Two days later, Delphos wrote to the other U.S. Shareholders informing them that he had sent a letter to Gerardo Avila, a manager of AXS, "instruct[ing] the management of AXS Bolivia, S.A. to deposit all revenues and other proceeds into the . . . trust accounts [set up for IDB's benefit under the Loan Agreement and related documents] and to comply with all other terms of the IDB loan agreement."[45] Delphos recommended that Leland, Brickfield, and Ochoa-Brillembourg do the same.[46] They complied by sending similar letters to Avila a few days later.[47]

On May 23, 2006, both AXS and NextG filed a lawsuit against IDB in Bolivia seeking a declaration that the Loan Agreement and related transaction documents are invalid and unenforceable (the "Bolivian Action").[48] This constituted yet another default under the Loan Agreement.

IV.   *This Case*

IDB commenced this action on August 16, 2006 against NextG, GIH, and the NextG Shareholders. The complaint seeks damages, specific performance and other relief for defendants' alleged breaches of Sections 5(e) and 5(f) of the SRA II in that they are said to have failed to ensure

---

[44]    Balber Decl. Ex. 27.

[45]    *Id.* Ex. 28.

[46]    *See id.*

[47]    *See id.* Ex. 30.

[48]    Balber Decl. Ex. 26 (Claim to Have Contracts Nullified).

that AXS did not default on the Loan Agreement.[49] In addition, plaintiff seeks indemnification, pursuant to Section 15 of the SRA II, for all damages, costs, and legal fees incurred in connection with this lawsuit and the Bolivian Action.[50] Defendants Leland, Brickfield, and Ochoa-Brillembourg move for summary judgment dismissing the claims against them.[51]

## Discussion

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[52] Where, as here, the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[53] In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[54]

---

[49] See Cpt. ¶¶ 43, 48, 51, 54.

[50] See id. ¶¶ 66-72; Pl. Rule 56.1 St. ¶ 42.

[51] Docket item 50.

[52] E.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000); see also FED. R. CIV. P. 56(c).

[53] Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Virgin At. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 273 (2d Cir. 2001).

[54] Celotex, 477 U.S. at 322-23; Raskin v. Wyatt Co., 125 F.3d 55, 65-66 (2d Cir. 1997).

*I.*      *Section 5(e) – "Shall Not Permit, Authorize, or Otherwise Cause"*

IDB does not contend that the movants authorized or directly caused a breach of the Loan Agreement. It concedes that Leland and Brickfield never were on the NextG board[55] and that, while Ochoa-Brillembourg was a director of NextG and AXS at least until October 7, 2005,[56] she never attended a board meeting of either company.[57] Moreover, there is no evidence that the movants ever voted at a shareholder meeting to authorize AXS to take any action that would have resulted in a default. The issue therefore is whether the movants breached the SRA II by "permitting" AXS to default.

"A person permits an act when he does not prevent it, although [it is] within his power and duty [to do so]."[58] Hence, the question is whether IDB has produced sufficient evidence to raise a genuine issue of fact as to whether the movants had the power and duty to prevent AXS's defaults, and if so, whether their failure to take action caused the defaults to occur.

---

[55]      Pl. Rule 56.1 St. ¶ 27.

[56]      *See id.* ¶ 28.

[57]      *Id.* ¶ 29.

Plaintiff points to evidence that Ochoa-Brillembourg signed numerous proxies delegating her board votes to others. *See, e.g.*, Balber Decl. Ex. 21. But the evidence does not indicate how Ochoa-Brillembourg instructed her representatives to vote or what resolutions were put to a vote at any meetings with respect to which she signed a proxy.

[58]      *People v. Knapp*, 206 N.Y. 373, 384, 99 N.E. 841, 845 (1912); *see also Robertson v. Ongley Electric Co.*, 82 Hun 585, 31 N.Y.S. 605, 608 (Sup. Ct. Gen. T. 1st Dep't 1894) ("The sense in which these words [to 'permit' and to 'suffer'] are generally used imports that the doing of certain things may be permitted or suffered without an affirmative act, but that it cannot be done without an omission to do some act which might have prevented it.").

A.     *The Power of Minority Shareholders*

The movants' principal argument is that they were minority shareholders of NextG and therefore lacked the power actually to cause or permit NextG, and therefore AXS, to do anything. They claim that they held too few shares to call a shareholder meeting or to pass a resolution at such a meeting. The most they could have done, the movants argue, was direct AXS's management to comply with the Loan Agreement, which they did in March 2006 to no avail.

While appealing, the argument ultimately fails at the summary judgment stage because the movants mistake formal requirements for the reality of corporate governance. Simply because a minority shareholder's voting power alone cannot cause a company to take or refrain from taking action does not mean that a minority shareholder never can influence a company's conduct. As plaintiff points out, there are many things the movants arguably could have done to try to prevent AXS's defaults. They perhaps could have attempted to combine with the other NextG Shareholders to call a shareholder meeting.[59] In addition, they perhaps could have "[l]obb[ied] management, [engaged in] persuasive advocacy at shareholder meetings, [made] demands on the Board of Directors, [or] even commence[d a] legal action against AXS or NextG."[60] The movants arguably "permitted" AXS to default by failing to take any of these actions. Moreover, Ochoa-Brillembourg was a director of AXS and NextG at least until October 2005, and possibly longer. She arguably "permitted" AXS to default by failing to attend board meetings or to persuade the board to call

---

[59]

See Matthews Decl. Ex. 3 (Rakowszcyk Depo.) at 72 (minority shareholders could have prevented defaults by "joining other shareholders, by convincing other shareholders to take actions by forcing its nominated directors to comply with the agreements").

[60]

Pl. Mem. 25.

shareholder meetings so that the directors or the shareholders could have resolved to prevent or cure AXS's defaults.

The evidence supports the conclusion that the movants were capable of acting jointly. It shows that NextG was a closely held corporation owned essentially by only seven individuals, that the movants each were connected to Delphos and communicated with him frequently,[61] and that Delphos rallied the U.S. Shareholders in March 2006 by having them send letters to Avila. Moreover, the NextG Shareholders acted in concert in signing the August 2003 Stock Purchase Agreement whereby they agreed to "cause NextG to purchase" shares of AES Holdings II. This tends to show that the movants in fact were capable of banding together with other NextG Shareholders and taking action as a group. Accordingly, there is an issue of fact whether the movants could have taken some action to try to influence AXS's conduct.

Furthermore, in order to hold the movants accountable for AXS's defaults, it will be insufficient for IDB simply to prove that the movants failed to take particular actions and that the defaults occurred. It must prove causation as well, that is, "but for" the movants' omissions, AXS would not have defaulted and IDB would not have been injured. Causation ordinarily is an issue for the finder of fact.[62]

It will be up to IDB to prove conclusively at trial that the U.S. Shareholders could have taken action and that their omissions caused AXS to default. This indeed may be a difficult and perhaps an impossible task. But the Court cannot say, as a matter of law, that it would have been

---

[61]     *See, e.g.*, Balber Decl. Ex. 6 (Delphos Depo.) at 116 (Delphos sent regular emails to the movants).

[62]     *E.g.*, *DePace v. Flaherty*, 183 F. Supp. 2d 633, 638 (S.D.N.Y. 2002).

impossible for the movants to affect AXS's conduct in some meaningful way. Summary judgment therefore is not warranted simply on the basis that the movants were minority shareholders.

### B.   Bolivian Government Mandates

The movants argue also that they lacked the power to prevent AXS's failure to deposit revenues into trust accounts because the Bolivian government had ordered AXS to use its revenues to pay other debts. They point to a March 15, 2006 letter sent by Avila to the U.S. Shareholders in response to their demands that AXS comply with the Loan Agreement. Avila there stated that, as of August 2005, IDB "required that the trust accounts on the loan that AXS maintains with [IDB] be swept." In consequence, "accounts payable to employees, to short and long-term social security and for taxes ha[d] accumulated." According to Avila, the Bolivian government in February 2006 ordered the company to pay "salaries and other labor payments," and the National Tax Service "threatened to close the company" and issued a resolution "requiring the seizure of the money and credits of the company until the payment in full of the debts for taxes." Hence, Avila explained, "it [was] impossible for AXS Bolivia to proceed with the deposit of its revenues in the trust accounts."[63] Based on this letter, the movants claim that it was impossible for them to perform under the SRA II.

"In general impossibility may be equated with an inability to perform as promised due to intervening events, such as an act of state or destruction of the subject matter of the contract."[64]

---

[63] Matthews Decl. Ex. 21.

[64] See, e.g., United States v. General Douglas MacArthur Senior Vill., Inc., 508 F.2d 377, 381 (2d Cir. 1974).

A government order prohibiting performance under a contract may be grounds for claiming impossibility,[65] but only where "the fault of the party owing performance did not contribute to the order. . . . Resolution of the defense of impossibility requires an examination into the conduct of the party pleading the defense in order to determine the presence or absence of such fault. In all but the clearest cases this will involve issues of fact" that preclude summary judgment.[66]

The burden of showing impossibility is on the party seeking to excuse performance.[67] The movants have failed to meet their burden. As a preliminary matter, Avila's letter, insofar as it is offered to prove the truth of the assertions made therein, is hearsay. It is not competent evidence to prove that the Bolivian government actually ordered AXS to pay labor costs and threatened to close the company if it did not pay taxes.  It therefore may not properly be considered for such purposes on this motion.[68]   Accordingly, summary judgment is not warranted based on Avila's March 15 letter.

---

[65]

  *See, e.g., Organizacion JD Ltda. v. United States Dep't of Justice*, 18 F.3d 91, 95 (2d Cir. 1994) (bank's failure to wire money as required by contract did not constitute breach where intervening government order seizing funds made performance impossible).

[66]

  *Lowenschuss v. Kane*, 520 F.2d 255, 265 (2d Cir. 1975).

[67]

  *E.g., J.J. Cassone Bakery, Inc. v. Consol. Edison Co. of New York, Inc.*, 168 Misc. 2d 272, 282, 638 N.Y.S.2d 898, 905 (N.Y. Sup. Ct. Westchester Co. 1996), *rev'd in part on other grounds*, 240 A.D.2d 634, 659 N.Y.S.2d 293 (2d Dep't 1997).

[68]

  *See* FED. R. CIV. P. 56(e) (affidavits in support of and against summary judgment "shall set forth such facts as would be admissible in evidence"); *Raskin*, 125 F.3d at 66 ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."); *see also, e.g., Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (unsworn letters are ordinarily are inadmissible hearsay that cannot be considered on a summary judgment motion).

II.    *Section 5(f)*

    A.    *Voting at Shareholder Meetings*

There is a dearth of evidence concerning NextG's shareholder meetings. Delphos stated in his deposition that one meeting took place in the summer of 2004 in connection with NextG's formation and that there were two subsequent meetings in connection with NextG capital calls – one in December 2004 or January 2005 and the other in February or March 2005.[69] The evidence does not indicate, however, what was discussed at these meetings, what resolutions, if any, were put to a vote, or whether these meetings were related in any way to AXS's defaults, which did not begin until April 15, 2005. Accordingly, IDB has produced no evidence that the movants had the opportunity, let alone failed, to vote at shareholder meetings so as to direct AXS's compliance with the Loan Agreement.

IDB argues that this is not fatal to its claim because the movants were to blame for not calling any meetings. It invokes the principle known as the prevention doctrine, which provides that "a party may not rely on another party's failure to perform a condition precedent to discharge that party's obligations under a contract where that party frustrated or prevented the occurrence of the condition."[70] This doctrine is inapposite. The SRA II did not make the calling of a shareholder meeting a condition of any party's performance. It simply required the NextG Shareholders to vote their shares in favor of AXS's compliance with the Loan Agreement at any shareholder meetings that

---

[69]

    Balber Decl. Ex. 6 (Delphos Depo.) at 85.

[70]

    *Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.*, 807 F. Supp. 1007, 1022 (S.D.N.Y. 1992) (citing *Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 135 A.D.2d 891, 892, 522, N.Y.S.2d 292, 293 (3d Dep't 1987)).

in fact took place. As no meetings were held, there never was an opportunity for the movants to vote one way or another. Hence, no breach ever occurred.

To the extent IDB claims that the movants breached the SRA II by failing to call shareholder meetings, the claim more properly is brought under Section 5(e) of the SRA II. That provision, as discussed above, arguably required the movants to take affirmative action, such as by calling shareholder meetings and proposing resolutions that perhaps would have prevented AXS from defaulting. Accordingly, IDB's claims based on Section 5(f)(i) of the SRA II must be dismissed.

B.    *Voting at Board Meetings*

With respect to claims brought under Section 5(f)(ii), the movants argue that even if they had managed to influence their nominated directors, this would have been to no avail, as the U.S. Shareholders nominated only 40 percent of NextG's board in 2005, when most of AXS's defaults occurred. This, too, is unpersuasive. Just as a minority of shareholders cannot be said to lack all ability to cause shareholder action, a minority of directors cannot be said to lack all ability to cause board action. Even a single director potentially is capable of persuading a majority or more of the board to adopt or reject any given resolution. It therefore is possible that if the movants had lobbied at least one of their nominated directors in 2005, that director would have convinced the others on the board either to vote for resolutions preventing or curing defaults, or to vote against resolutions causing defaults. Whether or not that actually would have occurred must be proved at trial.

III.   *Section 15 – Indemnification*

    A.   *This Action*

        A lawsuit brought by IDB alleging a breach of the SRA II plainly is litigation "arising out of or in connection with or relating to" the SRA II. Section 15's plain language therefore requires the NextG Shareholders to indemnify IDB for the cost of litigating this case.  The movants claim, however, that Section 15 cannot be given effect because that would produce an "absurd result." They repeat the argument that they were minority shareholders, powerless to affect NextG's or AXS's conduct, and that they therefore should not pay expenses arising from "meritless claim[s]" that "fail as a matter of law."[71] As indicated, however, many of plaintiff's claims do not fail as a matter of law. Whether they ultimately have merit is not a question that can be answered conclusively at this stage.

    B.   *The Bolivian Action*

        IDB's claim for indemnification in connection with the Bolivian Action is another matter. The evidence does not indicate that the Bolivian Action had anything to do with the SRA II. It challenged the enforceability of the Loan Agreement and related documents pertaining to the arrangements between AXS and IDB. Neither the terms of the SRA II nor the obligations of the parties thereto were at issue in the Bolivian Action. Accordingly, the lawsuit did not arise out of or have any connection to the SRA II.

        Perhaps the most that can be said is that the SRA II "contemplated" the Bolivian Action, as the initiation of that action constituted a default of the Loan Agreement, which Section

---

[71]   Def. Rep. Mem. 9-10.

5 of the SRA II required the NextG Shareholders to attempt to prevent. But this is too strained an interpretation of the contract. The most natural reading of the "transactions contemplated hereby" language of Section 15 is that the NextG Shareholders must indemnify IDB in lawsuits arising out of transactions that the SRA II provides for or governs. The Bolivian Action is not one of those lawsuits. Accordingly, plaintiff's claim for indemnification for expenses incurred in connection with the Bolivian Action must be dismissed.[72]

IV.     *Other Considerations*

        Finally, the movants suggest that IDB is not entitled to any relief because it did not invoke its rights under the SCA by instructing JP Morgan to take control of the shares and board of AES Holdings II. Simply because IDB had this option, however, does not mean that its failure to exercise it precludes all relief under the SRA II. "[U]nder New York law, contractual remedies are deemed to be nonexclusive absent some indication of contrary intent."[73] Nothing indicates that the

---

[72]

> If IDB succeeds at trial on its breach of contract claim, then this ultimately may prove to be beside the point, as IDB may be entitled to damages representing the fees and expenses incurred by IDB in litigating the Bolivian Action. This essentially would amount to indemnity. The difference, however, is that to succeed on the breach of contract claim, IDB will have to prove causation – but for the movants' omissions, the Bolivian Action would not have been filed. It would not have to prove this to get indemnity.

[73]

> *Palazzetti Import/Export, Inc. v. Morson*, No. 98 Civ. 722 (FM), 2001 WL 1568317, *9 (S.D.N.Y. Dec. 6, 2001) (citing *In re Hale Desk Co.*, 97 F.2d 372, 373 (2d Cir. 1938); *Papa Gino's of Amer., Inc. v. Plaza at Latham Assocs.*, 135 A.D.2d 74, 76, 524 N.Y.S.2d 536,

SCA and the SRA II were intended to provide exclusive remedies. Indeed, each contract stated that the remedies provided therein were "cumulative" and "not exclusive" of any "remedies provided by law."[74]

The movants of course may try to prove at trial that IDB failed to mitigate its damages and therefore is entitled to less relief than otherwise. But whether IDB would have been able to prevent all damages stemming from AXS's defaults had it enforced the SCA is a question of fact. Accordingly, the movants are not entitled to judgment as a matter of law on that issue.

*Conclusion*

The motion of defendants Leland, Brickfield, and Ochoa-Brillembourg for summary judgment dismissing the complaint [docket item 50] is granted to the extent that its claims for breach of Section 5(f)(I) of the SRA II and for indemnification with respect to the costs incurred in connection with the Bolivian Action are dismissed as to those defendants. It is denied in all other respects.

SO ORDERED.

Dated:          August 25, 2007

Lewis A. Kaplan
United States District Judge

---

[74]   538 (3d Dep't 1988); N.Y.U.C.C. § 2-719(b)), *aff'd,* 54 Fed. Appx. 698 (2d Cir. 2002).

SRA II § 12; SCA § 6.1.3.